W. S. THOMPSON ET AL. *v.* J. L. A. THOMPSON ET AL.

[57 South. 291.]

1. MUTUAL BENEFIT INSURANCE. *Contract. Application. Construction.*

Where a policy or certificate of insurance is taken in a mutual benefit association on application for membership by the insured, it is not necessary to make the application a part of the certificate, that there should be an express reference in words to the application, making it expressly a part of the contract. If there be in the certificate, or in the constitution or by-laws, such reference to the application as shows that it was the intention of the parties that the application should be a part of the certificate, then the court will so treat it.

2 MUTUAL BENEFIT INSURANCE. *Application. Certificate.*

Where in the constitution and by-laws of a mutual benefit associa-
tion there is a provision that on the receipt of the application
and fees a benefit certificate shall be issued under seal and made
payable as the member may direct in his application, and that
if the statements in the application for membership upon which
a benefit certificate was issued shall be untrue in any respect,
the certificate shall be void, such a provision has the effect to
make the application for membership a part of the certificate.

APPEAL from the chancery court of Hinds county.
HON. G. G. LYELL, Chancellor.

Suit by W. S. Thompson et al. against J. L. A. Thomp-
son et al. from a decree for defendant, plaintiff appeals.

Complainants and J. L. A. Thompson are the children
of one Susan Thompson, and defendant B. J. Thompson
(the son of J. L. A. Thompson) is the grandson of said
Susan Thompson. Susan Thompson took a policy of in-
surance in the United Woodmen Benefit Association, a
negro fraternal insurance society, on March 18, 1907;
the amount being for one thousand dollars. Her appli-
cation for the policy contains the following questions
and answers: "Q. To whom shall the policy be made
payable? A. J. L. A. Thompson two hundred dollars
and B. J. Thompson fifty dollars; other to children. Q.
What kin to you is the person to whom the policy is
made payable? A. Children and grandson." The pol-
icy, as issued, contained the following provisions: "No.
4. The beneficiary is J. L. A. Thompson and B. J. Re-
lationship, children and grandson." The letters "ren,"
in the word "children," are erased by drawing a line
through them. There is a dispute in the testimony as to
when this erasure was made, and whether with the con-
sent or knowledge of the insured, who could not read and
write. The policy remained in the hands of Vina Thomp-
son, the wife of J. L. A. Thompson, until the death of
the insured, which occurred on June 22, 1910, while she
was in good standing, when it was delivered to J. L. A.

Thompson. The society acknowledged its indebtedness for the full amount, one thousand dollars, and paid the money into court for distribution among the contestants.

J. L. A. Thompson and B. J. Thompson, the defendants, demanded the entire sum of money, while the appellants demanded seven hundred and fifty dollars for their part. Suit was instituted, and the chancellor entered a decree for defendants, awarding them the entire sum of one thousand dollars, and granted an appeal. The appellants claim that J. L. A. Thompson erased the suffix "ren" to the word "children" after the policy was delivered to him and after the death of Susan Thompson. J. L. A. Thompson denies that he ever did it at all. The supreme banker of the society testified that the letters "ren" had been stricken off the word "children" after the policy was issued, and that the records of his office showed the words "children and grandson" as the beneficiaries. The appellees claim that the letters "ren" were erased before the policy was received by Vina Thompson, and that it was the intention of the insured to leave all the proceeds to the appellees, but not to limit their portion thereof to two hundred and fifty dollars. Other facts appear in the opinion.

*Cassedy & Butler,* for appellants.

It is true in the case at bar the certificate does not expressly make the application a part of the contract, nor do the constitution and by-laws. Yet it is perfectly clear from the certificate and the constitution and by-laws that the application is a part of the contract. Thus, section 1 requires each member to procure a certificate and this can only be done by virtue of the uniform blank application provided for in section 11. Section 19 provides that upon the receipt and acceptance of the application, the name of the applicant, and other material facts, shall be entered upon the record, and a certificate issued payable as the member may direct in his applica-

tion. Let it be noted in this connection that the facts were entered of record and the certificate issued payable as the member directed in her application. Again, paragraphs 1 and 17e of the policy refer to the schedule and requires the member to warrant the truth of her answers therein. Section 23 of the constitution and by-laws provides that, "If the statements or declaration in the application for membership shall be in any respect untrue upon which a benefit certificate was issued, the benefit certificate shall be null and void, and of no effect," thus in effect writing the application into the certificate. If appellees' contention is to prevail, then the policy is and was void because J. L. A. Thompson and P. J. Thompson could not be related to the member as "children and grandson." *Harding* v. *Littlehall,* 150 Mass. 100; *International Order* v. *Roswell,* 48 S. W. 1108; *Fuss* v. *Kroner,* 24 Wkly. Law Bul. 400, 11 Ohio Dec. 85 (cited Cooley's Briefs on Insurance, LV. 3724.)

*W. J. Latham,* for appellants.

If the name of the person for whose benefit the insurance is obtained does not appear upon the face of the policy, or if the description of the insured is imperfect or ambiguous, extrinsic evidence may be resorted to, to ascertain the meaning of the contract; and when the meaning is thus ascertained the contract will be held to apply to the interest intended to be covered by it, and those persons will be deemed to be comprehended within it who were in the minds of the parties when the contract was made. Am. Dig. 28, 875; *Clifton* v. *Hope, Ins. Co.,* 45 N. Y. 454.

The rule that all papers in *pari materia* are to be read together as forming an entire contract, applies to an application for insurance in a beneficiary society. Cent. Dig., 28, 1871; *Grand Lodge A. O. U. W.* v. *Jesse,* 50 Ill. App. 101.

Court of equity can correct mistakes in insurance policies as well as all other written instruments.

When we consider the policy in connection with the application in this case no other possible conclusion can be reached than that the contract as made with Susan Thompson was intended to be for the benefit of her chilren (all of them) and her grandson. The question then, is with the appellants, and their prayer should have been granted.

*Wells & Wells,* for appellees.

We would call the attention of the court to the facts that neither the application on its face, in case at bar, makes it a part of the certificate of policy of insurance issued therein, nor does the certificate refer in any way, shape or form to the application on which it was issued, nor do the constitution and by-laws make the application a part of the contract or policy of insurance.

While for general purposes of construction, an application for insurance will be considered a part of the contract, if it is referred to in the policy or certificate of insurance in such a way as to indicate a clear intent to make it a part thereof (Cooley's Brief on Law of Insurance, Volume one, pages 676-677), and while an express reference to the application as making or constituting a part of the contract is not absolutely essential, still it must clearly appear from the language of the policy that the parties intended to make paper (application) a part of the contract, and a reference in merely general terms is not sufficient.

*Delonguemare* v. *Tradesman Insurance Company,* 2 N. Y. Super Ct. 629; *Wall* v. *Howard Insurance Company,* 13 Barb. (N. Y.) 383; *Sup. Lodge of Sons and Daughters of Protection* v. *Underwood,* 3 Neb. 798, 92 N. W. 1051.

It being true, then, as we contend in case at bar, that the application forms no part of the contract and on the face of the certificate the one thousand dollars being payable by name to J. L. A. Thompson and B. J. Thompson, the conclusion, as it seems to us, is irresistible that the money should go to said J. L. A. Thompson and son.

Argued orally by *George Butler,* for appellants.

WHITFIELD, C.

The application in this case directed that the policy should be made payable to "J. L. A. Thompson, two hundred dollars and B. J. Thompson, fifty dollars," in figures "other to children." It further stated that the relationship was children and grandson. The certificate or policy stated that the beneficiary was "J. L. A. Thompson and B. J. Thompson," without anything more. It stated the relationship to be, as originally written, children and grandson; but through the letters "ren" a line was drawn, erasing those letters, leaving the relationship in the certificate to stand child and grandson.

It is not necessary, to make the application a part of the certificate, that there should be an express reference in express words to the application, making it expressly a part of the contract. If there be in the certificate, or in the constitution or by-laws, such reference to the application as upon any fair construction makes it plain that it was the intention of the parties that the application should be a part of the certificate, then the court will so treat it. This is a fair result of all the authorities to which we have been referred on this point.

Section 19 of the constitution and by-laws provides as follows: "On receipt of application and fees, the supreme banker shall enter the name and such other facts as may be deemed necessary upon a register. The roll of each camp or circle, to be kept by itself and returned to the financial secretary." It further provides that a benefit certificate shall be issued under seal "and made payable as the member may direct in his application." Paragraphs 1 and 17e of the policy refer to the schedule and require the member to warrant the truth of her answers therein. Section 23 of the constitution and by-laws provides that, "if the statements or declaration in the application for membership shall be in any respect

untrue upon which a benefit certificate was issued, the benefit certificate shall be null and void and of no effect." This section 23 thus in effect writes the application into the certificate as a part of it. We are clearly of the opinion that these provisions in the constitution and by-laws to which we have just above referred, on any fair construction under the authorities, make the application in this case a part of the contract of insurance —a part of the certificate.

This leaves the case to turn upon the testimony as to whether this certificate was really issued as stated in the application, or whether there has been a change made in the beneficiaries in it, under the certificate without the consent or since the death of the assured—in other words, since the vesting of the right under the policy. Three witnesses, two sisters and one brother of J. L. A. Thompson, testified positively and emphatically that they saw J. L. A. Thompson erase the letters "ren" from the word "children" in the certificate after the death of the assured. J. L. A Thompson himself, his wife, and one other witness not related, and not interested, as she testifies, testify that the certificate, with the letters "ren" erased, was in that form when the certificate was sent back for collection, after the death of Susan Thompson, the assured. J. A. Q. Williams, the secretary of the association, testified that the certificate had been altered by the erasure of the letters "ren" from the word "children" in the certificate, and that that erasure occurred after he had issued the certificate, and that the policy was issued in accordance with the application as to names of beneficiaries, but not as to amounts; that he first got information of this change in a letter written to him in the fall of 1910, which letter directed how the checks should be made, calling attention to the alteration. The evidence showed that the assured died on the 22d day of June, 1910. The first knowledge, therefore, received by Williams of the alteration, being in the fall of 1910, was after the death of the assured.

The evidence- shows that the checks were first sent to Dr. Cowan, payable as indicated in the application. The policy was in the hands of J. L. A. Thompson, and, because the checks were not payable as the policy indicates, Cowan, who never had the policy, at J. L. A. Thompson's direction, returned the checks to Williams. Controversy thus got up as to the beneficiaries to whom the money should be paid, and the order paid the money into court, leaving the parties' rights to be determined by the court. Williams, on December 5, 1910, wrote to J. L. A. Thompson, stating that the money would be paid into court, and that he believed each child would get a part of it. J. A. Q. Williams, in a letter dated December 22, 1910, to Latham & Atwood, attorneys for appellants, stated that the reason the company did not put in the certificate the amounts to be paid, two hundred dollars to J. L. A. Thompson and fifty dollars to B. J. Thompson, was because, as he says, "we refuse to write that on the policy, as we promise to pay whatever is collected, not to exceed one thousand dollars." There is in the record a certified copy from the record book of policies and beneficiaries, kept in the office of J. A. Q. Williams, of the order, United Woodmen Benefit Association. This was the record kept by the company at Holly Springs. That record shows, under entry of March 13, 1907, as follows: "Susan A. Thompson; children and grandson, J. L. A. Thompson, B. J. Thompson." In other words, this record entry, made at the time of the application and the issuance of the policy, shows the beneficiaries to be the children and grandson, just as the application shows, without, however, showing the amounts, for the reason indicated in the letter above referred to from Wiilliams to Latham & Atwood.

Here, then, we have, three witnesses on one side swearing positively that the letters "ren" were stricken out by J. L. A. Thompson, after the death of the assured, and three witnesses on the other side, swearing to the

contrary in effect; J. L. A. Thompson swearing that he never made any such alteration, and his wife and one other witness, Fannie Magee, testifying that they (J. L. A. Thompson's wife and Fannie Magee) saw this policy when they got it out of the postoffice, and looked to see to whom it was payable, and that the policy was in the same condition then as to the erasure of the letters "ren" that it is now, the result of which, of course, would be, if true, that J. L. A. Thompson did not make the alteration thereafter. J. L. A Thompson also testifies that he read this policy over to his mother, who could not read or write, and that she said it was all right; that he was her oldest son, and she would just make it payable to him and his son, B. J., and that she made no objection to its being so paid; and that the policy at that time appeared just as it does now. J. L. A. Thompson, however, is the only witness who testifies to this fact. It further appears in evidence that Susan Thompson had another policy in what is known as the Jacob's Order, and that policy was payable to her husband and all her children.

In this confused and contradictory state of the testimony of the witnesses in the case, looking to their interest and all the other circumstances of the case, we feel far safer in the effort at reaching the truth in this case in accepting the certified copy of the record book of policies and beneficiaries, kept in the office of J. A. Q. Williams, at Holly Springs, than in relying upon this utterly contradictory mass of testimony given by the witnesses. That was a contemporary register, which was kept according to the provisions of the constitution and the by-laws, on which it was the duty of the proper authorities to enter the names of the beneficiaries; and the beneficaries named in their record are all the children and the grandson. Much as we dislike to reverse a chancellor on the facts, we are constrained to hold that this piece of record evidence should have controlled the judgment of the

chancellor, in view of the utterly contradictory nature of the testimony of the witnesses in the case. This record, made at the time the application was sent in, showing, as the constitution and by-laws required, on its face the names of the beneficiaries to whom the policy was to be issued, speaks the truth, as we believe, concerning this matter. If, as insisted by the appellees, the letters "ren" were stricken out in the lifetime of Susan Thompson, it is incredible that the beneficiaries in the policy could have been written in the official record as they are. We think it is far safer to rely on this contemporary record, which no one had interest to falsify, than upon the testimony delivered by the witnesses in the case, under the peculiar circumstances of the case.

*Reversed.*

PER CURIAM. The above opinion is adopted as the opinion of the court, and for the reasons therein indicated the decree of the court below is reversed, and a decree will be entered here for the appellants.

Suggestion of error filed and overruled.